# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 15-3102

JOHN L. FROST, APPELLANT,

V.

DAVID J. SHULKIN, M.D.,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Argued July 20, 2017)                           (Decided November 30, 2017)

*John F. Cameron*, of Montgomery, Alabama, and *Kenneth Carpenter*, of Topeka, Kansas, for the appellant.

*William Hornbeck*, with whom *Leigh A. Bradley*, General Counsel; *Mary Ann Flynn*, Chief Counsel; *Joan E. Moriarty*, Deputy Chief Counsel; and *Dustin P. Elias*, all of Washington, D.C., were on the brief for the appellee.[1]

Before DAVIS, *Chief Judge*, and SCHOELEN and BARTLEY, *Judges*.

BARTLEY, *Judge*: Veteran John L. Frost appeals through counsel an April 17, 2015, Board of Veterans' Appeals (Board) decision denying service connection for residuals of a gunshot wound (GSW) to the neck with retained missile, including as secondary to service-connected post-traumatic stress disorder (PTSD) and depressive disorder. Record (R.) at 3-17.[2] This matter was referred to a panel of the Court, with oral argument, to address whether a veteran is precluded, as a matter of law, from obtaining secondary service connection on a causation basis when the

---

[1] Leigh A. Bradley was General Counsel for the appellee when his brief was submitted to the Court, but as of the date this decision was issued, Ms. Bradley had resigned.

[2] The Board also denied an effective date earlier than June 25, 2001, for PTSD, a total disability evaluation based on individual unemployability (TDIU), and Dependent's Educational Assistance under 38 U.S.C. Chapter 35; however, the veteran does not raise any contentions of error with regard to these matters and the Court will not address them. *See* R. at 12-13; *Pederson v. McDonald*, 27 Vet.App. 276, 281-85 (2015) (en banc) (declining to review the merits of an issue not argued on appeal and dismissing the appeal of that issue); *Cacciola v. Gibson*, 27 Vet.App. 45, 48 (2014) (same). In addition, the Board remanded the issues of entitlement to an evaluation in excess of 70% for PTSD and depressive disorder and whether the veteran was competent to handle the disbursement of VA funds. R. at 13. Because a remand is not a final decision of the Board subject to judicial review, the Court does not have jurisdiction to consider these matters at this time. *See Howard v. Gober*, 220 F.3d 1341, 1344 (Fed. Cir. 2000); *Breeden v. Principi*, 17 Vet.App. 475, 478 (2004) (per curiam order); 38 C.F.R. § 20.1100(b) (2017).

In addition, for ease of readability, hereafter the Court will refer to the veteran's service-connected "PTSD and depressive disorder" as "PTSD."

secondary condition was incurred prior to the grant of service connection for, or diagnosis of, the primary condition. The Court holds that there is no such temporal requirement inherent in § 3.310(a), even when the veteran claims that the primary condition caused the secondary condition. Therefore, for a veteran to be service connected on a secondary basis under a causation theory, the primary disability need not be service connected, or even diagnosed, at the time the secondary condition is incurred. The Court further finds that the Board erred in failing to address whether a VA examination and linkage opinion regarding secondary service connection was necessary to decide the claim, and made other errors, thus requiring remand. Therefore, the Court will set aside the portion of the April 2015 Board decision denying service connection for GSW residuals, including as secondary to service-connected PTSD, and remand the matter for further development, if necessary, and readjudication consistent with this decision.

## I. FACTS

Mr. Frost served on active duty in the U.S. Army from November 1972 to September 1980. R. at 412, 2918. In February 1980, he was involved in an in-service train accident, injuring his shoulder and leg. R. at 4039, 4041. Post-service, in November 1982, the veteran was involved in an altercation with a store proprietor, which resulted in a GSW to the neck. *See* R. at 3998-99 (November 1982 police report noting that, during an argument, a store owner shot the veteran in the neck); R. at 3331 (November 1982 medical record indicating that the veteran became upset when his order was not completed to his satisfaction, he fractured the store owner's forearm, and the owner then shot him); R. at 4004 (September 1983 statement from the veteran that, during a disagreement with a store owner, the owner's son hit the veteran, the veteran reached for a weapon, and the store owner shot him). The December 1982 hospital discharge summary associated with the event indicated that during his emergency treatment he screened positive for barbiturates.[3]

In February 1983, Mr. Frost sought entitlement to VA non-service-connected pension benefits for left extremity paralysis that he indicated was due to the November 1982 GSW. *See* R. at 4011-12. In October 1983, a VA regional office (RO) found that injuries sustained from the 1982 GSW were not due to willful misconduct, noting that the store owner was charged with attempted murder. R. at 3965-66. An October 1983 treatment record indicated partial spinal cord damage, noted that the veteran was preoccupied with his disability, displayed psychologic

---

[3] Barbiturates are a class of drugs that act as a central nervous system depressant.

problems, and would benefit from psychologic help. R. at 3955. In August 1985, the RO found that Mr. Frost had become totally disabled in November 1982 and granted non-service-connected pension benefits for GSW residuals. R. at 3911-12. A March 1989 medical record noted, inter alia, an anxiety diagnosis and a psychiatry referral. R. at 1876.

In June 2001, the veteran filed a claim for service connection for PTSD, R. at 3598, 3605, which he claimed was the result of the February 1980 train accident, R. at 3573, and stated that his life became "destructible" following the November 1982 incident, *id*. During a June 2002 VA examination, Mr. Frost reported that, after the in-service February 1980 accident, he received two Article 15 punishments for fighting, he occasionally became physically abusive, and his wife filed for divorce shortly after he left service. R. at 3486-88. He also indicated that he began receiving Social Security benefits after sustaining the November 1982 GSW. R. at 3488. The examiner diagnosed PTSD with some psychotic features; noted recurring memories of the February 1980 train accident, estrangement from his children, unstable social relationships, hopelessness, and a daily sense of fear; indicated that the veteran was frequently troubled by train sounds both during the day and while asleep; and stated that these symptoms had persisted for 20 years, i.e., since June 1982. R. at 3490.

In July 2002, the RO granted service connection for PTSD, evaluated as 30% disabling, effective June 2001. R. at 3483. In August 2005, the Board granted a 70% PTSD evaluation effective June 2001 and remanded the issue of an effective date earlier than June 2001. R. at 3209, 3222. In December 2005, Mr. Frost filed a claim for service connection for GSW residuals as secondary to service-connected PTSD. R. at 2875. During a September 2008 VA examination, the veteran reported that in November 1982 he was involved in an argument with a store owner who shot him in the neck. R. at 1353. The examiner noted a cervical spine GSW and hemiparesis of the left extremities but stated that the veteran did not have any service-connected disabilities except for PTSD and that he was thus unable to express an opinion as to employability due to service-connected disability. R. at 1355 (noting a forthcoming examination).

In January 2009, the RO granted entitlement to a total disability evaluation based on individual unemployability (TDIU), effective March 2006, and denied service connection for the neck GSW with retained missile, stating that evidence did not show that this condition was related to service-connected PTSD but rather was the result of a dispute with a store owner. R. at 1339, 1347-48. In May 2009, Mr. Frost filed an NOD, R. at 276, and the RO issued a Statement of the

Case (SOC) in October 2010, R. at 199. In December 2010, the veteran perfected his appeal, arguing that, because the June 2002 VA examiner opined that PTSD symptoms had persisted for 20 years, they were present from at least June 1982, and that PTSD therefore caused him to become involved in the November 1982 dispute that resulted in the GSW. R. at 148-52.

A December 2013 VA examiner diagnosed substance-induced depressive disorder; anti-social personality disorder; and spouse or partner violence, physical suspected, R. at 4549; and noted the following PTSD symptoms: impaired impulse control such as unprovoked irritability with periods of violence, impaired judgment, and depressed mood, R. at 4560.

In April 2015, the Board issued the decision on appeal, denying service connection for GSW residuals, including as secondary to service-connected PTSD. R. at 12. The Board stated that contemporaneous records regarding the November 1982 incident did not suggest or confirm Mr. Frost's assertions that his behavior at that time was the result of PTSD; there was no evidence that the November 1982 incident was precipitated by PTSD; and the veteran's statements to that effect, when weighed against objective evidence, were neither credible nor probative. R. at 8-9. The Board found that the veteran was first shown to be suffering from PTSD no earlier than June 2002, 20 years after the November 1982 incident, and that, although an October 1983 treatment record noted that he displayed "a lot of psychological problems," there was no indication that the veteran exhibited psychologic symptoms at the time of the November 1982 incident. R. at 8. The Board concluded that it could not reasonably associate the veteran's GSW residuals with his service-connected PTSD. R. at 9. This appeal followed.

## II. ANALYSIS

### A. Arguments

Mr. Frost argues that the Board erroneously failed to consider favorable evidence when it denied service connection for GSW residuals secondary to service-connected PTSD and that it also erred in failing to obtain a medical examination as to whether GSW residuals are related to service-connected PTSD. Appellant's Brief (Br.) at 5-19.

The Secretary asserts in his brief that the veteran's claim must fail "because there is no potential for a grant of entitlement to service connection in this case." Secretary's Br. at 13. He contends that, because the Board finally established June 2001 as the proper effective date for service connection for PTSD, a date almost 20 years after the November 1982 incident that led to

4

the development of GSW residuals, those residuals "cannot be due to any service-connected psychiatric symptoms, as there was no service-connected psychiatric disability [in November 1982]." *Id.* He essentially argues that 38 C.F.R. § 3.310(a) would preclude a veteran from receiving entitlement to secondary service connection on a causation basis in cases where the purported primary condition is not service connected, or even diagnosed, at the time that the secondary condition was incurred. Secretary's Br. at 13-15. He notes that Mr. Frost sustained GSW residuals in November 1982 and was not diagnosed with or granted service connection for PTSD until years later and argues that therefore the GSW residuals could not be "due to" a service-connected psychiatric condition as Mr. Frost argues. *Id.*

At oral argument, the Secretary, without providing prior notice to the Court, changed his position on this matter. He conceded that a veteran may indeed be granted secondary service connection on a causation basis even when the purported primary condition is the subject of diagnosis and award of service connection after incurrence of the purported secondary condition. *See* Oral Argument at 35:41-37:42, *Frost v. Shulkin*, U.S. Vet App. No. 15-3102. Because this issue is a question of law not previously addressed by the Court, and to avoid future confusion as to the application of § 3.310(a) in situations such as Mr. Frost's, where the secondary condition manifested many years prior to service connection for, or even a diagnosis of, the purported primary condition, the Court is compelled to address the matter directly by panel decision. *See Frankel v. Derwinski*, 1 Vet.App. 23, 25-26 (1990).

### B. Entitlement to Secondary Service Connection on a Causation Basis Has a Single Temporal Requirement

This Court long ago established that a disability may be found service connected on a secondary basis if there is evidence demonstrating that the disability is (1) caused by a service-connected disease or injury or (2) aggravated by a service-connected disease or injury. *See Allen v. Brown*, 7 Vet.App. 439, 448 (1995) (en banc); 38 C.F.R. § 3.310(a) (2017). Because Mr. Frost does not argue that his GSW residuals were aggravated by his service-connected PTSD, the Court's analysis will focus on the former method of attaining secondary service connection, the causation basis.

Secondary service connection for VA benefit purposes is not addressed in any statute. Instead, the causation method of attaining secondary service connection is addressed in § 3.310(a), which provides in relevant part that a disability "proximately due to or the result of a service-

connected disease or injury shall be service connected." 38 C.F.R. § 3.310(a). Current precedent caselaw speaks to several aspects of the relationship between primary and secondary disabilities under § 3.310(a). *See Ellington v. Peake,* 541 F.3d 1364 (Fed. Cir. 2008) (effective dates); *Roper v. Nicholson,* 20 Vet.App. 173, 177-78 (2006) (interpreting the § 3.310(a) proviso that when secondary service connection is established, "the secondary condition shall be considered a part of the original condition"); *Allen,* 7 Vet.App. at 444-50 (analyzing whether § 3.310(a) contemplates aggravation of a non-service-connected condition by a service-connected condition). However, we have no explicit precedent caselaw concerning the temporal issue that the Secretary raised in his brief.

Normally when courts are faced with interpreting regulatory language, examination of the regulation's text is the starting point. *See Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 409 (1993) ("The starting point in interpreting a statute [or regulation] is its language."); *Petitti v. McDonald*, 27 Vet.App. 415, 422 (2015) ("Regulatory interpretation begins with the language of the regulation, the plain meaning of which is derived from its text and its structure."). If the plain meaning of the regulation is clear from its language, that meaning controls and that is the end of the matter. *Tropf v. Nicholson*, 20 Vet.App. 317, 320 (2006). However, if the language is ambiguous, courts should defer to the agency's interpretation of its regulation unless that interpretation is inconsistent with the language of the regulation or plainly erroneous or does not represent the agency's fair and considered view on the matter. *Auer v. Robbins*, 519 U.S. 452, 461-62 (1997); *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945); *Smith v. Nicholson*, 451 F.3d 1344, 1349 (Fed. Cir. 2006); *Petitti*, 27 Vet.App. at 423

In this case, the Secretary first argued a temporal component to § 3.310(a), that a veteran would be precluded as a matter of law from entitlement to secondary service connection on a causation basis where the purported primary condition was not service connected, or even diagnosed, at the time that the secondary condition was incurred. However, the plain language of § 3.310(a)—that a disability "proximately due to or the result of a service-connected disease or injury shall be service connected"—does not establish such a temporal requirement. *See Petitti*, 27 Vet.App. at 422. Nothing in the text of the regulation specifies or indicates that the primary condition must be service connected, or even diagnosed, at the time the secondary condition is incurred.

Because no language in the text refers to such a temporal requirement, the Court concludes that the plain meaning of § 3.310(a) is clear in this regard and we reject the Secretary's interpretation that would have Mr. Frost's claim barred as a matter of law. The temporal prerequisite affiliated with § 3.310(a) is one of basic logic that the Court has referenced in previous cases, i.e., that "there must be a primary service-connected condition for a claimant to establish entitlement to secondary service connection." *Smith v. Shinseki*, 24 Vet. App. 40, 49 (2010) (holding that principle "axiomatic" as to secondary service connection). In other words, at the time that any *decision* establishing entitlement to secondary service connection is rendered, there must be a primary service-connected condition.

Moreover, even were the language ambiguous on this point, the Court would have reservations concerning the Secretary's initial interpretation. A temporal requirement such as that suggested by the Secretary would make little sense given the current protracted nature of veterans benefits claims adjudication. The time from date of filing of a claim for service connection to date of resolution of that claim often exceeds several years and may exceed a decade. *See* BD. OF VETERANS' APPEALS, REPORT OF THE CHAIRMAN: FISCAL YEAR 2016, 22 (2016), *available at* https://www.bva.va.gov/docs/Chairmans_Annual_Rpts/BVA2016AR.pdf (average length of time between filing a VA Form 9 appeal and the Board's disposition was 1,785 days). That a veteran may file for service connection for a primary condition and not receive a final determination of entitlement until much later renders the Court unable to countenance an interpretation of § 3.310(a) that would require the primary disability to achieve service-connected status before the secondary disability is incurred or diagnosed.

In addition, the Court observes that a veteran has no obligation to file a compensation claim as soon as he or she becomes aware of disability. *See Browder v. Derwinski,* 1 Vet.App. 204, 208 (1991) (the Secretary may not raise the equitable defense of lack of diligence in pursuing a claim, commonly called laches, against veterans in benefits cases). And, in fact, a veteran may not become aware of disability immediately; instead, for a variety of reasons, awareness may follow some time after initial symptoms arise. *See, e.g.,* R. at 3557-61 (Mr. Frost indicates on his 2002 NOD that he was unaware of the disability called PTSD and queries how he could be expected to complain about a condition that he "did not have knowledge" of—stating, "I did not have any knowledge of PTSD. I was never inform[ed], un[til] now."). Absence of a filing deadline plus the potential lack of immediate recognition that a symptom portends an actual disability means that

7

veterans may suffer symptoms of not-yet-diagnosed disabilities some time before they file claims and are granted service connection. Given the potential for such scenarios, even were the language of § 3.310(a) not clear, the Court would have misgivings concerning the interpretation that the Secretary advocated in his brief.

To conclude, the Court holds that § 3.310(a) is clear that for a veteran to receive secondary service connection on a causation basis under § 3.310(a), the primary disability need not be service connected, or even diagnosed, at the time the secondary condition is incurred.[4] Thus, the Court accepts the Secretary's concession that Mr. Frost is not precluded from receiving an award of secondary service connection for GSW residuals that were incurred approximately 20 years prior to the grant of service connection for, and diagnosis of, PTSD.

## C. VA Examination and Opinion

After acknowledging that no temporal requirement such as that put forth in briefing is present under § 3.310(a), the Secretary asserted that the Court should affirm the Board determination that Mr. Frost's service-connected PTSD was not the proximate cause of GSW residuals. Oral Argument at 32:30-32:50. The veteran argues that the Board erred in failing to obtain a VA examination and opinion addressing whether the GSW residuals are as likely as not the result of service-connected PTSD. Appellant's Br. at 13-19; Appellant's Reply Br. 3, 6-8.

When developing claims, the Secretary's duty to assist includes providing a medical examination or opinion when there is (1) competent evidence of a current disability or persistent or recurrent symptoms of a disability; (2) evidence establishing that an event, injury, or disease occurred in service or establishing certain diseases manifesting during an applicable presumptive period for which the claimant qualifies; (3) an indication that the disability or persistent or recurrent symptoms of a disability "may be associated" with the veteran's service or with another service-connected disability; and (4) insufficient competent evidence on file for VA to make a decision on the claim. *McLendon v. Nicholson*, 20 Vet.App. 79, 81 (2006); *see* 38 U.S.C. § 5103A(d)(2); 38 C.F.R. § 3.159(c)(4)(i) (2017). The types of evidence that indicate that a current disability may be associated with military service "include, but are not limited to, medical evidence that suggests a nexus but is too equivocal or lacking in specificity to support a decision on the merits, or credible evidence of continuity of symptom[s,] such as pain or other symptoms capable

---

[4] Although the Secretary asserted that Mr. Frost's claim was legally null, the Court notes that the Board adjudicated the claim without demur. *See* R. at 8-9; *see also* Appellant's Reply Br. at 2-3.

8

of lay observation." *McLendon*, 20 Vet.App. at 83. The threshold for the third *McLendon* element is low. 38 U.S.C. § 5103A(d)(2)(B); *McLendon*, 20 Vet.App. at 83.

As with any findings on a material issue of fact and law presented on the record, the Board must support its duty to assist determination with an adequate statement of reasons or bases that enables the claimant to understand the precise basis for that determination and facilitates review in this Court. 38 U.S.C. § 7104(d)(1); *Pederson*, 27 Vet.App. at 286; *Gilbert v. Derwinski*, 1 Vet.App. 49, 52 (1990). To comply with this requirement, the Board must analyze the credibility and probative value of evidence, account for evidence it finds persuasive or unpersuasive, and provide reasons for rejecting material evidence favorable to the claimant. *Caluza v. Brown*, 7 Vet.App. 498, 506 (1995), *aff'd per curiam*, 78 F.3d 604 (Fed. Cir. 1996) (table).

Here, the Court notes that no VA examination or opinion was provided as to Mr. Frost's secondary service-connection claim and that the Board did not address whether VA satisfied its duty to assist in providing a medical examination, nor did it conduct a *McLendon* analysis. *See* R. at 6-9. The Board decision is devoid of mention of this aspect of the duty to assist. Although Mr. Frost is correct that a Board determination as to the necessity of a medical examination or opinion is reviewed by this Court under the "arbitrary, capricious, abuse of discretion, or otherwise not in accordance with law" standard, *see* Appellant's Br. at 13-19; *McLendon*, 20 Vet.App. at 81, because the Board made no determination in this case, the Court is unable to review the decision under that standard. Rather, the Court finds that the Board failed to provide reasons or bases sufficient for Mr. Frost to understand why he was not entitled to a VA examination or opinion. *See Gilbert*, 1 Vet.App. at 52.

The Court agrees with the veteran that remand is appropriate for the Board to address, in the first instance, entitlement to a VA examination and opinion regarding whether currently diagnosed GSW residuals are as likely as not the result of PTSD that is now service connected but that, at the time of the 1982 incident, was undiagnosed. *See* Appellant's Reply Br. at 8; *Buchanan v. Nicholson*, 451 F.3d 1331, 1337 (Fed. Cir. 2006) (the Board, as factfinder, is responsible for assessing the credibility, competence, and probative value of evidence); *Hensley v. West*, 212 F.3d 1255, 1263 (Fed. Cir. 2000) (noting "the general rule that appellate tribunals are not appropriate fora for initial fact[ ]finding"); *Tucker v. West*, 11 Vet.App. 369, 374 (1998) (remand is appropriate where the Board incorrectly applied the law or provided inadequate reasons or bases for its determination or where the record is otherwise inadequate). The Court notes that in assessing this

9

relationship the Board may require additional records to clarify any uncertainty as to the November 1982 incident. *See* 38 U.S.C. § 5103A(a)(1) (providing that the Secretary shall make reasonable efforts to assist a claimant in obtaining evidence necessary to substantiate his or her claim).

In addition, in determining that it could not reasonably associate GSW residuals with PTSD, the Board did not address the June 2002 VA examination, which noted that Mr. Frost's psychiatric symptoms had persisted for 20 years, R. at 3490, or the December 2013 VA examination, which discussed the appellant's PTSD symptoms including impaired impulse control and periods of violence, R. at 1009-24. On remand, the Board must discuss this potentially favorable evidence in its *McLendon* analysis. *See Caluza*, 7 Vet.App. at 507. Although the Secretary asserts that the June 2002 and December 2013 VA examination do not reference the cause of the November 1982 incident, how the veteran sustained a GSW from another individual, or suggest that the GSW residuals were due to service-connected PTSD diagnosed 20 years later, the Court cannot accept the Secretary's post-hoc rationalizations in lieu of reasons or bases from the Board. *See In re Lee*, 277 F.3d 1338, 1345–46 (Fed. Cir. 2002) ("'[C]ourts may not accept appellate counsel's post hoc rationalization for agency action.'") (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)); *Evans v. Shinseki*, 25 Vet.App. 7, 16 (2011) (explaining that "it is the Board that is required to provide a complete statement of reasons or bases, and the Secretary cannot make up for its failure to do so.").

The Court further notes that, rather than considering the need for a VA examination or opinion regarding whether GSW residuals were as likely as not proximately due to or the result of service-connected PTSD, in the absence of such an examination the Board appeared to rely on its own opinion when it determined that it was unable to reasonably associate the two. R. at 9; *see Colvin v. Derwinski*, 1 Vet.App. 171, 172 (1991) (Board must base medical conclusions on "independent medical evidence" rather than "provide [its] own medical judgment in the guise of a Board opinion"); *see also Kahana v. Shinseki*, 24 Vet.App. 428, 435 (2011) (when a Board inference "results in a medical determination, the basis for that inference must be independent and it must be cited"). The Board found that, although Mr. Frost claimed that PTSD caused the November 1982 incident, he was first shown to be *suffering* from PTSD no earlier than June 2002 and thus presumably this condition could not have caused the GSW. R. at 8. However, the veteran was *diagnosed* with PTSD in June 2002 and, according to the June 2002 VA examiner, his PTSD symptoms had persisted since June 1982. R. at 3490. Rather than address this physician's

statement, the Board erroneously provided, based on the date of his PTSD diagnosis, its own medical determination as to when Mr. Frost began suffering from PTSD and whether this condition could have caused the November 1982 incident and subsequent GSW residuals. On remand, the Court reminds the Board to refrain from relying on its own medical opinion. *See Colvin*, 1 Vet.App. at 172.

Finally, the Board provided inadequate reasons or bases for finding Mr. Frost not credible. *See Caluza*, 7 Vet.App. at 507. The Board stated that "the veteran's statements and history, when weighed against the objective evidence of record, are neither credible nor of particular probative value." R. at 9. However, the Board may not determine that lay evidence lacks credibility solely because it is unaccompanied by contemporaneous medical evidence, *Buchanan*, 451 F.3d 1331, which the Board did here when it found Mr. Frost not credible because "objective" evidence of record did not confirm his statements, R. at 9. On remand, the Board must readdress the veteran's credibility and avoid making any improper determinations.

In sum, the Court will remand for the Board to conduct a *McLendon* analysis, determine the necessity of a VA examination or opinion regarding whether GSW residuals are as likely as not proximately due to or the result of Mr. Frost's PTSD, which, although not diagnosed or service connected at the time of the 1982 incident, is now service connected and therefore meets the basic temporal requirement contained in § 3.310(a). The Board must provide adequate reasons or bases for its findings, address all favorable material evidence of record, and refrain from relying on its own medical opinion or making improper credibility determinations.

## III. CONCLUSION

Upon consideration of the foregoing, the portion of the April 17, 2015, Board decision denying service connection for GSW residuals including as secondary to service-connected PTSD and depressive disorder is SET ASIDE and the matter is REMANDED for further development, if necessary, and readjudication consistent with this decision.

11